REVISED January 17, 2012

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 10, 2012

Lyle W. Cayce
Clerk

No.  11-50814

TEXAS MEDICAL PROVIDERS PERFORMING ABORTION SERVICES,
a class represented by Metropolitan OBGYN, P.A.;
on behalf of itself and its patients seeking abortions,
doing business as Reproductive Services of San Antonio;
ALAN BRAID, on behalf of himself and his patients seeking abortions,

Plaintiffs - Appellees

v.

DAVID LAKEY, Commissioner of the Texas Department of
State Health Services, in his official capacity;
MARI ROBINSON, Executive Director of the
Texas Medical Board, in her official capacity,

Defendants - Appellants

Appeal from the United States District Court
for the Western District of Texas

Before JONES, Chief Judge, and HIGGINBOTHAM and SMITH, Circuit Judges.
EDITH H. JONES, Chief Judge:

Physicians and abortion providers — collectively representing all similarly situated Texas Medical Providers Performing Abortion Services ("TMPPAS") — sued the Commissioner of the Texas Department of State Health Services and

the Executive Director of the Texas Medical Board (collectively "the State") under 42 U.S.C. § 1983 for declaratory and injunctive relief against alleged constitutional violations resulting from the newly-enacted Texas House Bill 15 ("the Act"), an Act "relating to informed consent to an abortion." H.B. 15, 82nd Leg. Reg. Sess. (Tex. 2011). The district court granted a preliminary injunction against four provisions for violating the First Amendment and three others for unconstitutional vagueness. We conclude, contrary to the district court, that Appellees failed to establish a substantial likelihood of success on any of the claims on which the injunction was granted, and therefore VACATE the preliminary injunction. For the sake of judicial efficiency, any further appeals in this matter will be heard by this panel.

## Background

H.B. 15, passed in May 2011, substantially amended the 2003 Texas Woman's Right to Know Act ("WRKA"). The amendments challenged here are intended to strengthen the informed consent of women who choose to undergo abortions. The amendments require the physician "who is to perform an abortion" to perform and display a sonogram of the fetus, make audible the heart auscultation of the fetus for the woman to hear, and explain to her the results of each procedure and to wait 24 hours, in most cases, between these disclosures and performing the abortion. TEX. HEALTH & SAFETY CODE § 171.012(a)(4). A woman may decline to view the images or hear the heartbeat, § 171.0122(b), (c), but she may decline to receive an explanation of the sonogram images only on certification that her pregnancy falls into one of three statutory exceptions. Id. at § 171.0122(d).

Any woman seeking an abortion must also complete a form indicating that she has received the required materials, understands her right to view the

2

requisite images and hear the heart auscultation, and chooses to receive an abortion. § 171.012(a)(5). The physician who is to perform the abortion must maintain a copy of this form, generally for seven years. Id. at § 171.0121(b)(1)-(2).

If a woman ultimately chooses not to receive an abortion, the physician must provide her with a publication discussing how to establish paternity and secure child support. § 171.0123.

Finally, the Act amended the Texas Occupations Code to deny or revoke a physician's license for violating these provisions. TEX. OCC. CODE § 164.055(a). The Act went into effect on September 1, 2011, and was scheduled to apply to abortions after October 1, 2011.

Appellees filed suit on June 13, requesting a preliminary injunction shortly thereafter. Following extensive briefing, the district court preliminarily enjoined the disclosure provisions of the Act described above on the ground that they "compel speech" in violation of the First Amendment. The district court partially enjoined three other sections of the Act as void for vagueness: the phrase "the physician who is to perform the abortion," certain situations in which the district court viewed the obligations of the physician and the rights of the pregnant woman as conflicting, and enforcement of the Act against physicians for failing to provide informational materials when they do not know that a woman elected not to have an abortion.

The State promptly appealed and sought a stay pending appeal, which the district court denied. A motions panel of this court carried with the case the motion to stay enforcement of the preliminary injunction, but also ordered expedited briefing and oral argument.

Stay of Appellate Review

Appellees urge this court to defer ruling on the preliminary injunction because the district court has, notwithstanding this appeal, proceeded apace toward consideration of summary judgment. It is contended that our ruling on this interlocutory matter would become moot if the district court enters final judgment first, and that the district court will resolve issues not raised or decided at the preliminary phase. We decline to defer. First, this ruling will offer guidance to the district court, which is particularly important given our different view of the case. Second, the unresolved issues below are of secondary importance. Third, Appellees do not assert that fact issues pertinent to our ruling remain insufficiently developed.

## Standard of Review

"To be entitled to a preliminary injunction, the applicant[s] must show (1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) [their] substantial injury outweighs the threatened harm to the party whom [they] seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." Bluefield Water Ass'n, Inc. v. City of Starkville, Miss., 577 F.3d 250, 252-53 (5th Cir. 2009) (internal citation omitted). "We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion on all four requirements.'" Id. (quoting Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 195-96 (5th Cir. 2003)). An "absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." Lake Charles Diesel, Inc. v. Gen. Motors Corp., 328 F.3d 192, 203 (5th Cir. 2003).

We review legal conclusions made with respect to a preliminary injunction grant de novo. Bluefield Water Ass'n, 577 F.3d at 253.

## Discussion

I.  First Amendment

Appellees contend that H.B. 15 abridges their First Amendment rights by compelling the physician to take and display to the woman sonogram images of her fetus, make audible its heartbeat, and explain to her the results of both exams. This information, they contend, is the state's "ideological message" concerning the fetal life that serves no medical purpose, and indeed no other purpose than to discourage the abortion. Requiring the woman to certify the physician's compliance with these procedures also allegedly violates her right "not to speak." In fashioning their First Amendment compelled speech arguments, which the district court largely accepted, Appellees must confront the Supreme Court's holding in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S. Ct. 2791 (1992), that reaffirmed a woman's substantive due process right to terminate a pregnancy but also upheld an informed-consent statute over precisely the same "compelled speech" challenges made here. Following Casey, an en banc decision of the Eighth Circuit has also upheld against a compelled speech attack another informed consent provision regulating abortion providers. Planned Parenthood

Minnesota, et al. v. Rounds, 653 F.3d 662 (8th Cir. 2011).[1]  We begin this analysis with Casey.

The law at issue in Casey required an abortion provider to inform the mother of the relevant health risks to her and the "probable gestational age of the unborn child."  Casey, 505 U.S. at 881, 112 S. Ct. at 2822.  The woman also had to certify in writing that she had received this information and had been informed by the doctor of the availability of various printed materials "describing the fetus and providing information about medical assistance for childbirth, information about child support from the father, and a list of agencies which provide adoption and other services as alternatives to abortion."[2]  Id.  Planned Parenthood contended that all of these disclosures operate to discourage abortion and, by compelling the doctor to deliver them, violated the physician's First Amendment free-speech rights.  Planned Parenthood urged application of the strict scrutiny test governing certain First Amendment speech rights.  See Brief of Petitioners, 1992 WL 551419, at *54.

The Casey plurality's opinion concluded that such provisions, entailing "the giving of truthful, nonmisleading information" which is "relevant . . . to the

---

[1] See Planned Parenthood Minn. v. Rounds, 375 F.Supp.2d 881 (D.S.D. June 30, 2005) (granting preliminary injunction) (vacated); Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724 (8th Cir. June 27, 2008) ( en banc) (vacating grant of preliminary injunction and remanding); Planned Parenthood Minn., N.D., S.D. v. Rounds, 650 F.Supp.2d 972 (D.S.D. August 20, 2009) (granting partial summary judgment in favor of plaintiffs and partial summary judgment in favor of defendants) (affirmed in part, reversed in part); Planned Parenthood Minn. v. Rounds, 653 F.3d 662 (8th Cir., Sept. 2, 2011) (reversing grant of summary judgment in favor of plaintiffs on all but one claim and remanding) (vacated in part); Planned Parenthood Minn., N.D., S.D, v. Rounds, 662 F.3d 1072 (8th Cir. December 7, 2011) (vacating panel's affirmance of partial summary judgment in favor of plaintiffs and granting rehearing en banc on that issue).

[2] The description included a month by month explanation of prenatal fetal development.

decision," did not impose an undue burden on the woman's right to an abortion and were thus permitted by the Fourteenth Amendment. Id. at 882, 112 S. Ct. at 2823. The requirement that the physician relay the probable age of the fetus furthered the legitimate end of "ensur[ing] that a woman apprehend the full consequences of her decision." Id. In other words, "informed choice need not be defined in such narrow terms that all considerations of the effect on the fetus are made irrelevant." Id. at 883, 112 S. Ct. at 2824. As the Court noted, such information "furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision was not fully informed." Id. at 882, 112 S. Ct. 2791. States may further the "legitimate goal of protecting the life of the unborn" through "legislation aimed at ensuring a decision that is mature and informed, even when in doing so the State expresses a preference for childbirth over abortion." Id.

The plurality then turned to the petitioners'

> asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the state. To be sure, the physician's First Amendment rights not to speak are implicated, see Wooley v. Maynard, 430 U.S. 705, 97 S. Ct. 1428 (1977), but only as part of the practice of medicine, subject to reasonable licensing and regulation by the State, cf. Whalen v. Roe, 429 U.S. 589, 603, 97 S. Ct. 869, 878 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the state here.

Id. at 884, 112 S. Ct. at 2824.

The plurality response to the compelled speech claim is clearly not a strict scrutiny analysis. It inquires into neither compelling interests nor narrow

7

tailoring. The three sentences with which the Court disposed of the First Amendment claims are, if anything, the antithesis of strict scrutiny. Indeed, the plurality references Whalen v. Roe, in which the Court had upheld a regulation of medical practice against a right to privacy challenge. 429 U.S. 589, 97 S. Ct. 869 (1977). The only reasonable reading of Casey's passage is that physicians' rights not to speak are, when "part of the practice of medicine, subject to reasonable licensing and regulation by the State[.]" This applies to information that is "truthful," "nonmisleading," and "relevant . . . to the decision" to undergo an abortion. Casey, 505 U.S. at 882, 112 S. Ct. at 2823.

The Court's decision in Gonzales v. Carhart, 550 U.S. 124, 127 S. Ct. 1610 (2007), reaffirmed Casey, as it upheld a state's "significant role . . . in regulating the medical profession" and added that "[t]he government may use its voice and regulatory authority to show its profound respect for the life within the woman." 550 U.S. at 128, 127 S. Ct. at 1633. The Court addressed in detail the justification for state regulations consistent with Casey's reaffirming the right to abortion:

> Whether to have an abortion requires a difficult and painful moral decision. While we find no reliable data to measure the phenomenon, it seems unexceptionable to conclude that some women come to regret their choice to abort the infant life they once created and sustained. Severe depression and loss of esteem can follow.
>
> In a decision so fraught with emotional consequence some doctors may prefer not to disclose precise details of the means that will be used, confining themselves to the required statement of risks the procedure entails. From one standpoint this ought not to be surprising. Any number of patients facing imminent surgical procedures would prefer not to hear

> all details, lest the usual anxiety preceding invasive medical procedures become the more intense. This is likely the case with the abortion procedures here at issue [partial-birth abortions].
>
> . . . . The State's interest in respect for life is advanced by the dialogue that better informs the political and legal systems, the medical profession, expectant mothers, and society as a whole of the consequences that follow from a decision to elect a late-term abortion.

Id. at 157-59, 1633-34 (citations omitted).

The import of these cases is clear. First, informed consent laws that do not impose an undue burden on the woman's right to have an abortion are permissible if they require truthful, nonmisleading, and relevant disclosures. Second, such laws are part of the state's reasonable regulation of medical practice and do not fall under the rubric of compelling "ideological" speech that triggers First Amendment strict scrutiny.[3] Third, "relevant" informed consent may entail not only the physical and psychological risks to the expectant mother facing this "difficult moral decision," but also the state's legitimate interests in "protecting the potential life within her." 505 U.S. at 871, 112 S. Ct. at 2791. See also Casey, 505 U.S. at 882, 112 S. Ct. at 2823 ("Nor can it be doubted that most women considering an abortion would deem the impact on the fetus relevant, if not dispositive, to the decision. In attempting to ensure that a woman apprehends the full consequences of her decision, the State furthers the legitimate purpose of reducing the risk that a woman may elect an abortion, only to discover later, with devastating psychological consequences, that her decision

---

[3] But see Casey, 505 U.S. at 872 ("Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage her to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term[.]").

9

was not fully informed.") Finally, the possibility that such information "might cause the woman to choose childbirth over abortion" does not render the provisions unconstitutional. Id. at 889, 112 S. Ct. at 2791.

Fortifying this reading, the Eighth Circuit sitting en banc construed Casey and Gonzales in the same way:

> . . . [W]hile the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion, <u>even if that information might also encourage the patient to choose childbirth over abortion.</u>

Planned Parenthood Minn. v. Rounds, 530 F.3d 724, 735 (8th Cir. 2008) (en banc) (emphasis added). Significantly, the Rounds dissent agreed that the state's reasonable medical regulation of abortion includes its assertion of "'legitimate interests in the health of the mother and in protecting the potential life within her.'" Rounds, 530 F.3d at 741 (Murphy, J., dissenting) (quoting Casey, 505 U.S. at 871, 112 S. Ct. 2791). Rounds upheld, against compelled speech challenges, an informed consent provision, and associated compliance certifications by both the physician and pregnant woman, requiring, inter alia, a disclosure that the abortion "will terminate the life of a whole, separate, unique, living human being" with whom the woman "has an existing relationship" entitled to legal protection. Rounds, 530 F.3d at 726.

In contrast to the disclosures discussed in Rounds, H.B. 15 requires the taking and displaying of a sonogram, the heart auscultation of the pregnant woman's fetus, and a description by the doctor of the exams' results. That these medically accurate depictions are inherently truthful and non-misleading is not

disputed by Appellees, nor by any reasoned analysis by the district court.[4] (We consider later the Appellees' argument that the disclosures are not medically necessary, and are therefore "irrelevant" to procuring the woman's informed consent under Casey). Unlike the plaintiffs in Casey and Rounds, the Appellees here do not contend that the H.B. 15 disclosures inflict an unconstitutional undue burden on a woman's substantive due process right to obtain an abortion. These omissions, together, are significant. If the disclosures are truthful and non-misleading, and if they would not violate the woman's privacy right under the Casey plurality opinion, then Appellees would, by means of their First Amendment claim, essentially trump the balance Casey struck between women's rights and the states' prerogatives. Casey, however, rejected any such clash of rights in the informed consent context.

Applying to H.B. 15 the principles of Casey's plurality, the most reasonable conclusion is to uphold the provisions declared as unconstitutional compelled speech by the district court. To belabor the obvious and conceded point, the

---

[4] At times, the district court characterizes these disclosures as "ideological," but the court misunderstands the term. Speech is ideological when it is "relating to or concerned with ideas" or "of, relating to, or based on ideology." See "ideological," www.mirriam-webster.com/dictionary/ideological. Of course, any fact may "relate" to ideas in some sense so loose as to be useless, but in the sense in which Wooley discusses it, "ideological" speech is speech which conveys a "point of view." See Wooley, 430 U.S. at 715, 97 S. Ct. at 1435 ("Here . . . we are faced with a state measure which forces an individual . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable."). The speech in Wooley was the statement of a point of view that the plaintiff found "morally, ethically, religiously and politically abhorrent." Id. at 713, 1434. The distinction the Court there sought to employ was between factual information and moral positions or arguments. Though there may be questions at the margins, surely a photograph and description of its features constitute the purest conceivable expression of "factual information." If the sonogram changes a woman's mind about whether to have an abortion—a possibility which Gonzales says may be the effect of permissible conveyance of knowledge, Gonzales, 550 U.S. at 160, 127 S. Ct. at 1634—that is a function of the combination of her new knowledge and her own "ideology" ("values" is a better term), not of any "ideology" inherent in the information she has learned about the fetus.

required disclosures of a sonogram, the fetal heartbeat, and their medical descriptions are the epitome of truthful, non-misleading information. They are not different in kind, although more graphic and scientifically up-to-date, than the disclosures discussed in Casey—probable gestational age of the fetus and printed material showing a baby's general prenatal development stages. Likewise, the relevance of these disclosures to securing informed consent is sustained by Casey and Gonzales, because both cases allow the state to regulate medical practice by deciding that information about fetal development is "relevant" to a woman's decision-making.[5]

As for the woman's consent form, that, too, is governed by Casey, which approves the practice of obtaining written consent "as with any medical procedure." 505 U.S. at 883, 112 S. Ct. at 2823. H.B. 15, § 171.012(a)(5), requires that a pregnant woman certify in writing her understanding that (1) Texas law requires an ultrasound prior to obtaining an abortion, (2) she has the option to view the sonogram images, (3) she has the option to hear the fetal heartbeat, and (4) she is required to hear the medical explanation of the sonogram unless she falls under the narrow exceptions to this requirement.[6]

To invalidate the written consent form as compelled speech would potentially subject to strict scrutiny a host of other medical informed-consent

---

[5] At oral argument, Appellees' counsel conceded that Appellees have no objection to the requirements that a doctor perform and make available sonogram images of the fetus. Their objection is to requiring a "display" and an oral explanation of the images.

[6] The three exceptions are (1) pregnancy as a result of rape or incest which has been reported or, if it has not been reported, was not reported because the woman reasonably risks retaliation resulting in serious bodily injury, (2) a minor taking advantage of judicial bypass procedures to avoid parental notification, or (3) a fetus with an irreversible medical condition or abnormality. If seeking to avoid the description of the sonogram images, the woman must indicate within which exception she falls.

requirements. Appellees have offered no theory how the H.B. 15 informed-consent certification differs constitutionally from informed-consent certifications in general.

Nevertheless, the district court was especially troubled by the requirement that, to avoid the description of the sonogram images, a victim of rape or incest might have to certify her status as a victim, despite fearing (by the very terms of the certification) physical reprisal if she makes her status known. This system of certified exceptions may be a debatable choice of policy, but it does not transgress the First Amendment. If the State could properly decline to grant any exceptions to the informed-consent requirement, it cannot create an inappropriate burden on free speech rights where it simply conditions an exception on a woman's admission that she falls within it. Indeed, such an infirmity could just as well be cured by striking down the exceptions alone as by striking down the requirement of written certification. Because the general requirement is valid, we see no constitutional objection to the certification required for an exception.

Notwithstanding the facial application of Casey to H.B. 15, Appellees characterize its disclosure requirements as "qualitatively different" in two ways. First, the disclosure of the sonogram and fetal heartbeat are "medically unnecessary" to the woman and therefore beyond the standard practice of medicine within the state's regulatory powers. Appellees refer to currently required disclosures of health risks to the mother alone and apparently would limit information about the fetus in these circumstances to its "probable gestational age," as specifically approved in Casey. Requiring any more information about the fetus amounts to advocacy by the state. Second, whereas Casey only required the physician to make certain materials about childbirth

and the fetus "available" to the woman, the physician here is required to explain the results of sonogram and fetal heart auscultation, and the woman is required to listen to the sonogram results. This interchange makes the physician the "mouthpiece" of the state, again for medically unnecessary reasons.[7] Appellees' position seems to assume that the facts of Casey represent a constitutional ceiling for regulation of informed consent to abortion, not a set of principles to be applied to the states' legislative decisions. On this broad level, however, the Court has admonished that federal courts are not the repository for regulation of the practice of medicine. See Gonzales, 550 U.S. at 157-58, 127 S. Ct. at 1633.

Turning to Appellees' specific objections, the provision of sonograms and the fetal heartbeat are routine measures in pregnancy medicine today. They are viewed as "medically necessary" for the mother and fetus. Only if one assumes the conclusion of Appellees' argument, that pregnancy is a condition to be terminated, can one assume that such information about the fetus is medically irrelevant. The point of informed consent laws is to allow the patient to evaluate her condition and render her best decision under difficult circumstances. Denying her up to date medical information is more of an abuse to her ability to decide than providing the information. In any event, the Appellees' argument ignores that Casey and Gonzales, as noted above, emphasize that the gravity of the decision may be the subject of informed consent through factual, medical

---

[7] Appellees and the district court also question why H.B. 15 had to add these disclosures to the existing Casey-like requirements of the WRKA. The necessity or wisdom of legislation, of course, is a decision committed to the peoples' elected representatives and thus beyond the purview of the courts—apart from the constitutionality of the law.

detail, that the condition of the fetus is relevant, and that discouraging abortion is an acceptable effect of mandated disclosures.[8]

More to the point, perhaps, is Appellees' concern that H.B. 15 requires a doctor, at a minimum, to converse with the patient about the sonogram as a predicate to securing informed consent, rather than show her the way to obtain a brochure or similar written information. Certainly, the statute's method of delivering this information is direct and powerful, but the mode of delivery does not make a constitutionally significant difference from the "availability" provision in Casey. The Casey plurality opinion places this issue squarely in the context of the regulation of medical practice:

> Our prior decisions establish that as with any medical procedure, the State may require a woman to give her written informed consent to an abortion. [citation omitted] In this respect, this statute is unexceptional. Petitioners challenge the statute's definition of informed consent because it includes <u>the provision of specific information by the doctor</u> . . .
>
> . . .
>
> We also see no reason why the State may not require doctors to inform a woman seeking an abortion of the availability of materials relating to the consequences to the fetus . . . . [analogizing to informed consent bearing on the donor as well as recipient of a kidney transplant.]

Casey, 505 U.S. at 881, 112 S. Ct. at 2823 (emphasis added). Casey did not analyze the doctor's status based on how he provided "specific information." Similarly, in Wooley, the font of Appellees' compelled speech argument, the New Hampshire auto owner was not required to speak "Live Free or Die," he was

---

[8] Another perspective on this point is to note that under Casey and Gonzales, what Appellees think is medically necessary does not cabin, under the state's legitimate power, the regulation of medicine, as Casey holds.

merely required to display the phrase on his license plate. The mode of compelled expression is not by itself constitutionally relevant, although the context is. Here, the context is the regulation of informed consent to a medical procedure. The constitutional irrelevance of the verbal nature of this description is even clearer given the facts of Casey; the law upheld there required doctors to describe verbally the fetus's gestational age, a description which the Casey plurality acknowledged was relevant to "informed consent" only in a sense broad enough to include the potential impact on the fetus. Casey, 505 U.S. at 883, 112 S. Ct. at 2823.

For all these reasons, we conclude that the enumerated provisions of H.B. 15 requiring disclosures and written consent are sustainable under Casey, are within the State's power to regulate the practice of medicine, and therefore do not violate the First Amendment.[9] Appellees have not demonstrated a likelihood of success on the merits justifying the preliminary injunction.

II. Vagueness

The Due Process Clause requires states define their enactments — and prohibitions — with some specificity. U.S. v. Williams, 553 U.S. 285, 304, 128 S. Ct. 1830, 1845 (2008). "[T]he void-for-vagueness doctrine" requires states articulate a proscription "with sufficient definiteness that ordinary people can understand what conduct is prohibited" while providing enough objective metrics that it "does not encourage arbitrary and discriminatory enforcement."

---

[9] That Casey and Gonzales state principles broad enough to encompass the H.B. 15 disclosures and informed consent certificate eliminates any necessity to rule on the Appellees' earlier argument, adopted by the district court, that compelled speech is only constitutionally permissible in the context of "pure commercial speech." The statement is clearly overbroad, but we need not analyze it further.

Gonzales, 550 U.S. at 149. "The degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment," with greater tolerance for statutes imposing civil penalties and those tempered by scienter requirements. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498-99, 102 S. Ct. 1186, 1193 (1982).

As we are "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." Hill v. Colorado, 530 U.S. 703, 733, 120 S. Ct. 2480, 2498 (2000) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S. Ct. 2294 (1972)). Our analysis therefore cannot focus upon the marginal cases in which an ordinarily plain statutory command can nonetheless yield some mote of uncertainty. "[S]peculation about possible vagueness in hypothetical situations not before the [c]ourt will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" Hill, 530 U.S. at 733 (internal citation omitted); see also Am. Commc'ns Ass'n, C.I.O. v. Douds, 339 U.S. 382, 412, 70 S. Ct. 674, 691 (1950). We must remember "the elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." Gonzales, 550 U.S. at 153.

We are aware that the penalties under the law do not evidently require scienter and result in revocation or non-licensure of a physician, and potential criminal sanctions for any abortion without sufficient informed consent. We also note that the district court accepted only three out of multiple vagueness challenges raised by the Appellees. We turn to the three portions of H.B. 15 the district court enjoined as unconstitutionally vague in some applications.

A.     "The physician who is to perform the abortion"

The district court first concluded the phrase "the physician who is to perform the abortion" was "unconstitutionally vague under some circumstances" regarding the timing and making of required disclosures.  § 171.012(a)(1), (2), (3), (4), (6).  The State asserts that most abortions are performed by a single physician, and that in the rare circumstances where more than one physician is involved, compliance by any physician or combination of physicians satisfies the requirements of H.B. 15.  Thus, the statute applies to "the physician who is to perform," rather than the physician "who performs," the abortion.  Appellees, by contrast, insist that physicians in multi-doctor practices would face substantial uncertainty under this definition:  when more than one doctor collaborates to perform an abortion, it is unclear who is "the physician who is to perform the abortion."  Appellees raise a similar challenges for doctors "filling in" for colleagues in performing abortions.

The district court acknowledged the State's position was reasonable — and then summarily dismissed it as merely "argument."  Absent a "binding interpretation" of the phrase "the physician who is to perform the abortion," the court disregarded the State's construction.  The court enjoined penalizing a physician when any one or combination of physicians has complied with the disclosure requirements.

We do not disagree with the district court's result, but that is because we conclude that the same result is compelled by the statutory language requiring compliance by "the physician who is to perform" the abortion.  In multiphysician practices, this could necessitate more careful scheduling of the sonograms and disclosures 24 hours prior to the procedure.  But it is also reasonable to construe the law grammatically as allowing compliance by the physician who "intends"

18

or "is intended" to perform, even if unforeseen circumstances result in the abortion's actually being performed by a substitute. So construed, this provision is not vague.

Moreover, other cases have addressed identical appellations of the doctor, seemingly without legal challenge. See, e.g., Casey: "the physician who is to perform the abortion." Casey, 505 U.S. at 902. In Rounds, the South Dakota statute also imposed duties upon "the physician who is to perform the abortion," again without incurring a distinct legal challenge. Rounds, 530 F.3d at 726-27. See Brief of Appellants, 2005 WL 4902899; Brief of Appellees, 2005 WL 4902901. That Appellees' argument is novel does not defeat it, but novelty suggests its weakness.

B.    Conflict between Section 171.012(a)(4) and Section 171.0122

The district court further concluded Sections 171.012(a)(4) and 171.0122 are in conflict, resulting in constitutionally intolerable uncertainty. The relevant sections provide respectively:

Section 171.012. Voluntary and Informed Consent

(a) Consent to an abortion is voluntary and informed only if:
. . .
> (4) . . . at least 24 hours before the abortion or at least two hours before the abortion if the pregnant woman waives this requirement . . . :
>> (A) the physician who is to perform the abortion or an agent of the physician who is also a sonographer certified by a national registry of medical sonographers performs a sonogram on the pregnant woman on whom the abortion is to be performed;
>> (B) the physician who is to perform the abortion displays the sonogram images in a quality consistent with current medical

practice in a manner that the pregnant woman may view them;

(C) the physician who is to perform the abortion provides, in a manner understandable to a layperson, a verbal explanation of the results of the sonogram images, including a medical description of the dimensions of the embryo or fetus, the presence of cardiac activity, and the presence of external members and internal organs; and

(D) the physician who is to perform the abortion or an agent of the physician who is also a sonographer certified by a national registry of medical sonographers makes audible the heart auscultation for the pregnant woman to hear, if present, in a quality consistent with current medical practice and provides, in a manner understandable to a layperson, a simultaneous verbal explanation of the heart auscultation[.] (emphasis added.)

Section 171.0122. Viewing Printed Materials and Sonogram Image; Hearing Heart Auscultation or Verbal Explanation

(a) A pregnant woman may choose not to view the printed materials [provided by another section].

(b) A pregnant woman may choose not to view the sonogram images required to be provided to and reviewed with the pregnant woman under Section 171.012(a)(4).

(c) A pregnant woman may choose not to hear the heart auscultation required to be provided to and reviewed with the pregnant woman under Section 171.012(a)(4).

(d) A pregnant woman may choose not to receive the verbal explanation of the results of the sonogram images . . . if [she satisfies one of three exceptions subject to documentation].

(e) The physician and the pregnant woman are not subject to a penalty under this chapter solely because the pregnant woman

chooses not to view the printed materials or the sonogram images, hear the heart auscultation, or receive the verbal explanation, if waived as provided by this section.

The district court noted that the introduction to Section 171.012(a) nominally broaches no exceptions, because a woman's consent to an abortion is informed and voluntary only if a physician complies with its requirements. The court then observed that Section 171.0122 exempts pregnant women from several of these requirements by providing what the pregnant woman may do, rather than under what circumstances the physician need not comply with (a)(4)'s requirements. The district court read the provisions together as intending, but not succeeding, to create a requirement and an exception. Thus, a doctor who complies with the disclosures (§ 171.012(a)) may lose his license even though the woman decided not to view the sonogram or hear the fetal heartbeat (§ 171.0122). The district court discounted the text of 171.0122(e), which states that neither the physician nor the pregnant woman would be penalized "solely because the pregnant woman chooses" not to view the sonogram results, hear her child's heart auscultation, or receive a verbal explanation from her physician. The court viewed the word "solely" as constitutionally intolerable "legislative 'gotcha' tactics." In sum, the court severed the word "solely" from Section 171.0122(e) for enforcement purposes, and further enjoined enforcement of the provisions against physicians for failure to display sonogram images or make audible heart auscultation results whenever the pregnant woman elects not to view the former or hear the latter.

The district court's skeptical interpretation of Section 171.0122(e) follows from its belief that the disputed provisions do not represent a harmonious pair of regulation and exception. We disagree. Section 171.012(a)(4) establishes

what the physician must do: have a sonogram performed, display the sonogram images, perform a heart auscultation, and provide verbal explanations of the sonogram images and heart auscultation. The district court's analysis of (a)(4) ignores that the physician's unconditional obligations are merely to display images so they may be viewed, to provide an understandable explanation, and to make audible the auscultation. Section 171.012(a)(4) specifically does not require the physician to ensure the woman views the images, that she understands the explanation, or that she listens to the auscultation. Contrast this language with the one requirement of 171.012(a)(4) that the pregnant woman may not waive: Section 171.012(a)(4)(A) states that the physician or his agent must perform a sonogram.

Section 171.0122 complements this language by expressly reserving to every pregnant woman the unconditional rights to refuse to view the sonogram images or hear the fetal heartbeat, and, if she falls into one of the three exceptions, the additional right not to hear the physician's explanation of the sonogram images. Taken together, the physician's duties are more than "reasonably clear" — a physician intending to perform an abortion must sonogram the woman, display the appropriate images, obtain a heart auscultation, and tender the verbal explanations, unless refused (for the sonogram explanation alone) pursuant to one of the exceptions listed in Section 171.0122(d). The woman seeking an abortion may elect not to attend to these images, sounds, or, in some cases, explanations. This election does not obviate the physician's obligations to display the sonogram images or make audible the heart auscultation; the woman may simply choose not to look or listen.

Unlike the district court, we perceive no vagueness in exempting a physician from various regulatory consequences "solely because" the woman elected not to participate in the disclosures under § 171.0122. Eliminating "solely" means that "whenever" a woman resorts to this election, the physician faces no adverse consequences from flouting the disclosures. This alteration encourages evasion of the disclosures and manipulation of the woman's statutory opt-out. The legislature had every right to maintain the integrity of the mandated disclosures and displays by relieving a physician of liability for non-compliance "solely" when the pregnant woman invokes § 171.0122. Appellees failed to demonstrate a substantial likelihood that Sections 171.012(a)(4) and 171.0122 conflict in an unconstitutionally vague way.

C.    Providing printed materials under Section 171.0123

Section 171.0123 provides in relevant part:

> If, after being provided with a sonogram and the information required under this subchapter, the pregnant woman chooses not to have an abortion, the physician or an agent of the physician shall provide the pregnant woman with a publication developed by [the relevant State agency] that provides information about paternity establishment and child support . . . .

The district court found troubling the absence of "mention of the physician's knowledge," combined with the fact that the section "contains no language suggesting the physician is ever exempt from the obligation to provide additional information." The court concluded that while the section did not need to impart to a physician "how . . . [to] comply with this duty," it failed to inform physicians "what . . . [they] must do to comply with the requirements of the Act." The district court enjoined the State from penalizing a physician, "criminally or otherwise," for failing to provide printed materials under Section 171.0123 "in

23

cases where the physician does not know whether the woman has chosen to have an abortion."

On its face, this provision appears fairly flexible, permitting either a physician or his designated agent to disseminate the required materials. No doubt rules and regulations will be promulgated to specify the "what" and "how" of compliance. However, the district court and Appellees focused on the potential problem of a physician's not knowing whether a woman has chosen to have an abortion, and thereby being uncertain of his duty to furnish the State's publication on paternity and child support if a woman who has elected not to undergo an abortion simply misses a follow-up appointment, or fails to schedule another visit with the physician. The obvious solution to any potential ambiguity about a knowledge requirement is for a physician's office to disseminate the material whenever the woman fails to appear for her abortion. No extreme burden is placed on the physician, nor is the woman harmed if she receives the printed matter, whether or not she carried out an abortion. This vagueness complaint is, at bottom, trivial.

## Conclusion

Appellees failed to demonstrate constitutional flaws in H.B. 15. Accordingly, they cannot prove a substantial likelihood of success on each of their First Amendment and vagueness claims. This is fatal to their application for a preliminary injunction. Accordingly, we VACATE the district court's preliminary injunction, REMAND for further proceedings consistent with this opinion, and any further appeals in this matter will be heard by this panel.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I join the panel opinion and with the freedom of writing without decisional force offer a different accent upon the appropriate role of the First Amendment in this case. To my eyes there are two settled principles in speech doctrine that inform our decision today. First, in protection of a valid interest the state need not remain neutral in its views and may engage in efforts to persuade citizens to exercise their constitutional right to choose a state-preferred course. Second, the state cannot compel a citizen to voice the state's views as his own. It is immediately apparent that both of these principles are implicated by state regulation of doctors' communications with their patients. It is equally apparent that, given the Supreme Court's decision in Casey, each is fully and appropriately abided today, without diminishing their vitality.

The doctor-patient relationship has long been conducted within the constraints of informed consent to the risks of medical procedures, as demanded by the common law, legislation, and professional norms. The doctrine itself rests on settled principles of personal autonomy, protected by a reticulated pattern of tort law, overlaid by both self- and state-imposed regulation. Speech incident to securing informed consent submits to the long history of this regulatory pattern.

The Court's decision in Casey accented the state's interest in potential life, holding that its earlier decisions following Roe failed to give this interest force at all stages of a pregnancy and that in service of this interest the state may insist that a woman be made aware of the development of the fetus at her stage of pregnancy. Significantly, the Court held that the fact that such truthful, accurate information may cause a woman to choose not to abort her pregnancy only reinforces its relevance to an informed decision. Insisting that a doctor give this information in his traditional role of securing informed consent is permissible. Texas has done just this and affords three exceptions to its

required delivery of information about the stage of fetal growth where in its judgment the information had less relevance, a legislative judgment that is at least rational.

Casey opens no unfettered pathway for states to suppress abortions through the medium of informed consent. Casey spoke of frameworks for affording a woman accurate information relevant to the risks attending her decision. Those plainly included the immediate risks of the procedure and the risks attending a failure to appreciate the potentiality of life. At the same time, Casey recognized that frameworks for obtaining informed consent to abortion must leave the ultimate decision with the woman, whose fully informed decision cannot be frustrated by the state. Today we abide Casey, whose force much of the argument here fails to acknowledge. It bears reminding that Roe survived Casey only in a recast form, relinquishing reaches that no longer support much of the criticism leveled at this Texas statute. We must and do apply today's rules as best we can without hubris and with less sureness than we would prefer, well aware that the whole jurisprudence of procreation, life and death cannot escape their large shrouds of mystery, yet, and perhaps not, to be lifted by advances of science.