MURPHY, Circuit Judge,
with whom WOLLMAN, BYE, and MELLOY, Circuit Judges, join, dissenting.
The record before the district court supported its conclusions that South Dakota’s 2005 suicide advisory is unconstitutional because it will not inform the free choice of a woman and is not consistent with the medical evidence. These conclusions have only been strengthened by the medical evidence received since then. The governing rule of law is that laid down by the Supreme Court in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), which prohibits a state from requiring an advisory which is not “calculated to inform the woman’s free choice” but “hinder[s] it.” Id. at 877, 112 S.Ct. 2791. Gonzales v. Carhart, 550 U.S. 124, 127 S.Ct. 1610, 167 L.Ed.2d 480 (2007), on which the majority relies, did not address that standard.
The most reliable evidence in the record shows that abortion does not have a causal relationship to the risk of suicide and that South Dakota’s mandated advisory is not truthful, but actually misleading. In Casey, the Court recognized both a woman’s right “to decide to terminate a pregnancy free of undue interference by the State” and the state’s “legitimate goal of ... ensuring a decision that is mature and informed” in order to “facilitate[ ] the wise exercise of that right.” 505 U.S. at 883, 887, 112 S.Ct. 2791. Focus on these parallel goals in Casey shows how carefully the Court considered the interests of both the woman and the state in that decision.
In order to be constitutional an informed consent requirement must be truthful, non misleading, and relevant. See Casey 505 U.S. at 882-83, 112 S.Ct. 2791; see also Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 735 (8th Cir.2008) (en banc). Requiring physicians to provide their patients with information that does not meet this standard violates the physicians’ First Amendment right against compelled speech. Casey, 505 U.S. at 884, 112 S.Ct. 2791; see also Rounds, 530 F.3d at 734-35.
The content of the 2005 suicide advisory raises constitutional problems which the prior version of the South Dakota statute did not. The previous provision required a physician to advise a patient about the “particular medical risks associated with the particular abortion procedure to be employed, including when medically accurate, the risks of infection, hemorrhage, danger to subsequent pregnancies, and infertility.” S.D.C.L. § 34-23A-10.1(1)(b) (2003) (emphasis added). In contrast, the statute before the court requires doctors to tell a pregnant woman that a greater likelihood of suicide and suicide ideation is a “known medical risk [ ]” to which she “would be subjected” by having an abortion. S.D.C.L. § 34-23A-10.1(l)(e) (2005) (emphasis added).
The record clearly demonstrates, however, that suicide is not a known medical risk of abortion and that suicide is caused instead by factors preexisting an abortion such as a history of mental illness, domestic violence, and young age at the time of *908 pregnancy. See, e.g., Julia R. Steinberg, et al., Does the Outcome of a First Pregnancy Predict Depression, Suicidal Ideation, or Lower Self-Esteem? Data from the National Comorbidity Survey, 81 Am. J. Orthopsychiatry 193 (2011); Gail Erlick Robinson, et al., Is There an “Abortion Trauma Syndrome?” Critiquing the Evidence, 17 Harv. Rev. Psychiatry 268 (2009).
As can be seen, the prior version of the South Dakota law did not carry the fatal flaw embodied in the statute now being considered. The wording of the statute under consideration conveys a causal relationship between abortion and the risk of suicide “to which the pregnant woman would be subjected.” The phrase to subject someone to something means “to cause to undergo or submit to.” Webster’s Third New Int’l Dictionary 2275 (2002). In contrast, the wording in the prior state legislation spoke of the “risks associated with ... abortion.” An association is defined as “the relationship of the occurrence of two events, without evidence that the event being investigated actually causes the second condition.” Taber’s Cyclopaedic Med. Dictionary 201 (21st ed. 2009). Legislative findings show that the statutory drafters intended that the advisory under review convey causality, for they stated that women must be informed that “procedures terminating the life of an unborn child impose risks to the life and health of the pregnant woman.” S.D.C.L. § 34-23A-1.4 (emphasis added); Webster’s Third New Int’l Dictionary 1136 (2002) (defining “impose” as “to cause to be burdened”).[10]
The majority concedes that there is no proof in the medical literature that abortion causes suicide, ante at 895-96, and it recognizes that an advisory telling a woman that abortion causes an increased risk of suicide would be untruthful. Ante at 897-98. It seeks to avoid the constitutional problem created by the current statutory text by suggesting that the legislature’s amendment substituting subjected to for “associated with” should not be understood to mean causality since nearly all of the words in the advisory were changed. The new language is explained as merely informing women that their decision to have an abortion would “cause[ ] [them] to become a member of a group” with a statistically higher rate of suicide. Ante at 896. That is not what the plain language of the statute says, however, and the medical evidence shows that women sharing certain factors may have a higher rate of suicide but not that abortion causes suicide.
The evidence considered by the district court shows that an advisory informing women that abortion causes them to be more likely to commit suicide is untruthful and misleading. That record made clear that abortion does not cause a “known” risk of suicide or suicide ideation. The record included volumes of deposition testimony, published medical research, and legislative reports supporting the district court’s conclusion that the suicide advisory is unconstitutional.
One of the significant reports in the record was the American Psychological Association’s (APA) review of the medical *909 literature. That review showed only an association between women who have an abortion and woman who commit suicide. The APA’s review concluded that “the best scientific evidence indicates that the relative risk of mental health problems among adult women who have an unplanned pregnancy is no greater if they have an elective first-trimester abortion than if they deliver that pregnancy.” Brenda Major, et al., American Psychological Association, Report of the APA Task Force on Mental Health and Abortion 68 (2008) (APA Report).
There was also evidence from the “most recent edition of medical opinions” by the American College of Obstetricians and Gynecologists (ACOG) showing that the ACOG shared the APA’s interpretation of the medical literature and informed its members that abortion does not affect women’s subsequent mental health. The record included evidence that the label for the abortion inducing drug mifepristone was never revised to include the risk of suicide or suicide ideation. That was relevant in light of the Food and Drug Administration requirement that drug labeling must “be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved.” 21 C.F.R. § 201.80(e).
In addition the district court was made aware of the fact that the author of two of the studies, on which the state and intervenors rely, has explained that his findings did not “support the hypothesis that abortion itself causes suicide.” Mika Gissler, et al., Letter to the Editor: Pregnancy-Related, Violent Deaths, 27 Scand. J. Pub. Health 54, 55 (1999). Gissler concluded that “[a] more likely explanation is that the excess risk may be due to causes related both to induced abortion and violent death.” Id.
The record included other criticisms of studies presented by the state and the intervenors which had used comparator groups irrelevant to a pregnant woman’s decision to have an abortion. Because pregnant women can no longer choose not to become pregnant, providing them information about the relative risks of suicide for women after abortion compared with women with no pregnancy does nothing to inform their decision on whether to have an elective abortion. See, e.g., Mika Gissler, et al., Injury Deaths, Suicides and Homicides Associated with Pregnancy, Finland 1987-2000, 15 European J. Pub. Health 459, 460 (2005) (comparing women electing abortion with women who are not pregnant); David M. Fergusson, et al., Abortion in Young Women and Subsequent Mental History, 47 J. Child Psychol. & Psychiatry 16, 17 (2006) (same); see also APA Report at 53-54, 71 (discussing this methodological problem).
Since the district court enjoined the suicide advisory and a panel of this court affirmed that decision, the United Kingdom’s Royal College of Obstetricians and Gynaecologists (RCOG) has issued recommendations that women “be informed that the evidence suggests that they are no more or less likely to suffer adverse psychological sequelae whether they have an abortion or continue with the pregnancy and have the baby.” RCOG, The Care of Women Requesting Induced Abortion 45 (Nov. 2011). The United Kingdom’s National Collaborating Centre for Mental Health arrived at the same conclusion in its report to the Academy of Medical Royal Colleges. Induced Abortion and Mental Health: A Systemic Review of the Mental Health Outcomes of Induced Abortion, Including Their Prevalence and Associated Factors 125 (Dec. 2011).
These conclusions are based on numerous studies which strengthen the evidence *910 on which the district court relied. The studies establish that post abortion suicide rates are linked to preexisting mental illness and domestic violence, not to the decision to undergo an abortion. See, e.g., Trine Much-Olsen, et al., Induced First-Trimester Abortion and Risk of Mental Disorder, 364 New Eng. J. Med. 332, 338 (2011); Robinson, supra, at 276 (“The most well controlled studies continue to demonstrate that there is no convincing evidence that induced abortion of an unwanted pregnancy is per se a significant risk factor for psychiatric illness.”). If, as the majority points out, “the standard medical practice ... is to recognize a strongly correlated adverse outcome as a ‘risk’ while further studies are conducted to clarify whether various underlying factors play causal roles,” ante at 899 (emphasis omitted), must not research conducted by experts in the field after the district court’s decision be considered as corroboration of its findings and conclusions?
Dr. Priscilla Coleman, an expert witness produced by the state and intervenors in the district court, has recently been criticized for her study methodology and her resulting conclusions that abortion plays a causal role to increase the risk of suicide. In one study researchers used the same data and methodology Coleman had in a 2009 study discussed in one of her declarations to the district court. Guhin Deck, Exh. 87 at 13, ECF No. 290-2. The researchers found that Coleman’s results were not replicable and concluded that “structural, psychological, and sociodemographic risk factors associated with both having an abortion and having poor mental health drive a relationship between abortion and mental health.” Julia R. Stein-berg & Lawrence B. Finer, Examining the Association of Abortion History and Current Mental Health: A Reanalysis of the National Comorbidity Survey Using a Common-Risk-Factors Model, 72 Soc. Sci. & Med. 72, 81 (2011). The editor-in-chief of the Journal of Psychiatric Research subsequently concluded that Coleman’s explanation for her methodology in the 2009 study was “unpersuasive” and that the analysis “does not support [Coleman’s] assertions” that abortions “were associated with increased risk of lifetime mental disorders----” Reply to Letter to the Editor: Commentary on Abortion Studies of Steinberg and Finer (Soc. Sci. & Med. 2011; 72:72-82) and Coleman (J. Psychiatric Res. 2009; 13:770-6 & J. Psychiatric Res. 2011; 15:1133-1), 46 J. Psychiatric Res. 410, 410 (2012).
The quality of the cited studies has been recognized by leading professional associations. This research also formed the basis for the opinions of these bodies that the induced abortion of an unwanted pregnancy does not cause an increased risk of mental health problems. See, e.g., National Collaborating Centre for Mental Health, supra at 125-27. Rather than recognizing this emerging consensus based on the scientific research in the record before the district court and all the subsequently submitted evidence by the parties to this court, the majority theorizes about the nature of an advisory. In the end it arrives at a new test divorced from the standard established in Casey.
The majority posits that the lack of evidence — that the correlation between abortion and suicide is due to a causal relationship — is not fatal to the advisory because the existence of a correlation for any reason makes the advisory truthful. Pointing out that Planned Parenthood does not currently challenge the state’s depression advisory, it asserts that “as a matter of common sense” depression can be a precursor to suicide. Ante at 899. While Planned Parenthood withdrew its challenge to that section of the statute, it never conceded that “depression and related psychological *911 distress” are known medical risks of abortion nor does it inform its patients of this. Resp. Pet. for Reh’g n. 8. Even a study submitted by the intervenors admits that data do not support an association between abortion and depression. David M. Fergusson, et al. A Further Meta-Analysis, Br. J. of Psychiatry, Oct. 5, 2011 available at http://bjp.rcpsych.Org/content/199/3/180/ reply#bjprepsych_eL.33839.[11]
The majority concedes though that if the correlation between abortion and suicide were not due to a causal relationship, then the advisory “would be misleading or irrelevant to the decision to have an abortion because the patient’s decision would not alter the underlying factors that actually cause the observed increased risk of suicide.” Ante at 899. The vast majority of researchers, however, assert that this is precisely the case. Those studies in the record show that other independent factors which co-occur with both abortion and suicide, such as prepregnancy mental health problems, domestic violence, and youth, account for the correlation between abortion and suicide risk.
To overcome this evidentiary problem a new standard for informed consent advisories is offered. Under this proposed test, so long as a causal link between abortion and suicide would be theoretically possible, an advisory is truthful, non misleading, and relevant unless Planned Parenthood can prove the absence of a causal link with “scientifically accepted certainty.” Ante at 900. In support the court turns to Gonzales, 550 U.S. at 163-67, 127 S.Ct. 1610, to rely on its discussion of medical uncertainty. Ante at 899-900, 904-05. The Court there was not considering a Casey issue about informed consent, however, and it was not evaluating the information given to an individual woman to “ensur[e] a decision that is mature and informed.” See Casey, 505 U.S. at 883, 112 S.Ct. 2791. The Court concluded only that Congress, which was fully informed of the contradicting medical opinions, could balance the need to protect the state’s interests in the “ethics of the medical profession” and “respect for dignity of human life” against the uncertain risks to women’s health resulting from the ban. Gonzales, 550 U.S. at 157, 166, 127 S.Ct. 1610 (citation omitted).
The state’s interest in this case is to promote a “wise,” “mature[,] and informed” decision by women considering abortion. Casey, 505 U.S. at 883, 887, 112 S.Ct. 2791. Here, any medical uncertainty as to whether abortion causes an increased risk of suicide undermines the advisory’s constitutionality because a woman’s ability to make a wise, mature, and informed choice is hindered by being told that the increased risk of suicide is a “known medical risk[ ]” “to which ... [she] would be subjected” by having an abortion when the weight of the medical research indicates the opposite and she is not informed of the debate. The state’s interest is thus not furthered by such an advisory.
It is significant that the South Dakota legislature and governor amended certain abortion regulations in March 2012 in order to reflect the more accepted view in the medical community that abortion does not cause mental health problems such as suicidal ideation and suicide. In the new version of the statute, which requires a physician to meet with a pregnant woman before she can schedule an abortion, the *912 state legislature eliminated language mandating an assessment “to determine if any of the risk factors associated with abortion are present in her case.” S.D. House Bill 1254 § 2 ¶ 4 (amending S.D.C.L. § 34-23A-56). The state law now requires an assessment “to determine if any of the following preexisting risk factors associated with adverse psychological outcomes following an abortion are present in her case.” Id. Among the listed preexisting risk factors in South Dakota’s revision are coercion, a history of mental illness, and youth. Id. This amendment thus brings the statute in line with the existing medical evidence which shows that an increased risk of suicide is linked not to the decision to undergo an abortion, but to preexisting risk factors that coincide with abortion.
We agree that “[t]he point of informed consent laws is to allow the patient to evaluate her condition and render her best decision under difficult circumstances” and that “[d]enying her up to date medical information is more of an abuse to her ability to decide than providing the information.” See ante at 905 (quoting Tex. Med. Providers Performing Abortion Servs. v. Lakey, 667 F.3d 570, 579 (5th Cir.2012)) (first alteration in original). Yet, instead of recognizing that medical research has shown that South Dakota’s suicide advisory is untruthful, misleading, and irrelevant, the majority tries to shift the responsibility to attending, physicians to “review! ] the research in the field, understand! ] the difference between relative risk and proof of causation, and explain! ] it correctly to their patients.” Ante at 905. The statute provides only for a written transaction between doctor and patient in which explanation and clarification occur if a woman requests it, see S.D.C.L. § 34-23A-10.1 ¶¶ 2, 3, but no judicial attempt to direct the content of the conversation between a patient and her doctor can remedy the advisory’s constitutional shortcomings.
By forcing doctors to inform women that abortion subjects them to a risk which the record medical evidence refutes, the suicide advisory places an undue burden on a pregnant woman’s due process rights and violates a doctor’s First Amendment right against compelled speech. The district court’s order enjoining the suicide advisory should therefore be affirmed.

. The majority states that the statutory phrase "to which a pregnant woman would be subjected” attaches to “statistically significant risk factors.” Ante at 896. The phrase "statistically significant risk factors” was permanently enjoined by the district court as unconstitutionally vague, Planned Parenthood Minn., N.D., S.D. v. Rounds, 650 F.Supp.2d 972, 981-82 (D.S.D.2009), however, and that ruling was not appealed by the state or the intervenors. Applying the rule of the last antecedent to the enjoined text effectively reads the phrase "to which a pregnant woman would be subjected” out of the statute as well, counter to the legislature's intent as expressed in its findings.

. While citing dictum from Gonzales that "[sjevere depression and loss of esteem can follow” abortion in support of the advisory's truthfulness, the majority ignores the Court’s concession there that it "find[s] no reliable data to measure the phenomenon....” Gonzales, 550 U.S. at 159, 127 S.Ct. 1610. The absence of “reliable data” undermines reliance here on an isolated statement in a lengthy opinion dealing with an uncommon medical procedure.