# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-3405

_____

Christopher Keating

*Plaintiff - Appellee*

v.

University of South Dakota; James Abbott; Royce Engstrom; Donald Dahlin;
Matthew Moen; Timothy Heaton; Christina Keller; South Dakota Board of
Regents; Mike Rounds

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: May 16, 2014
Filed: July 2, 2014
[Unpublished]

_____

Before GRUENDER, BOWMAN, and SHEPHERD, Circuit Judges.

_____

PER CURIAM.

The University of South Dakota, the South Dakota Board of Regents, James
Abbott, Royce Engstrom, Donald Dahlin, Matthew Moen, Timothy Heaton, Christina
Keller, and Mike Rounds appeal the district court's grant of declaratory relief in favor

of Christopher Keating on his claim that a provision in the university's employment policy is unconstitutionally vague. For the reasons described below, we reverse.

Keating joined the university's faculty as a tenure-track physics professor in 1999. The only other full-time physics professor was Dr. Christina Keller, the program director and Keating's immediate supervisor. Over time, Keating and Keller's working relationship became highly strained. In the fall of 2003, Keating filed a formal grievance against Keller with their department head, Dr. Timothy Heaton. Around the same time, Keller accused Keating of sexually harassing her. Heaton investigated both claims and ultimately concluded that Keating's claim lacked merit. During his investigation, Heaton met with Keating at least twice. Keating admits that, during the first meeting, he "became quite angry" with Heaton. After Heaton issued an initial report disagreeing with Keating's claim, Keating had a second meeting with Heaton, during which Keating interrupted Heaton and "warned" him that pursuing Keller's accusations of sexual harassment "would make the situation extremely serious."

Later that academic year, Heaton sent an email message instructing Keating that "if you know something needs to be approved by [Keller], . . . then it would be better to approach [Keller] or me directly." Keating responded by email:

> I came to you with a problem and you made it infinitely worse. Your actions have caused permanent damage to my relationship with the two of you. There is no way I can trust you with another problem. I cannot communicate with Dr. Keller because she is a lieing [sic], back-stabbing sneak.

Following the 2003-2004 academic year, Keating was informed that his employment contract with the university had not been renewed because his email had violated a section of Appendix G of the university's employment policy that provides:

Faculty members are responsible for discharging their instructional, scholarly and service duties civilly, constructively and in an informed manner. They must treat their colleagues, staff, students and visitors with respect, and they must comport themselves at all times, even when expressing disagreement or when engaging in pedagogical exercises, in ways that will preserve and strengthen the willingness to cooperate and to give or to accept instruction, guidance or assistance.

Keating brought this lawsuit against the university and several of its employees and administrators, alleging that the non-renewal of his contract and the enforcement of Appendix G against him violated a variety of constitutional provisions. Although the district court granted summary judgment in favor of the defendants on all but one of these claims, it held that Appendix G's "civility clause" was impermissibly vague, in violation of the Due Process Clause of the Fourteenth Amendment, and granted Keating declaratory relief on that issue. The defendants timely appealed the district court's grant of declaratory relief in favor of Keating.[1]

We review a constitutional challenge to a governmental policy *de novo*. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 686 F.3d 889, 893 (8th Cir. 2012) (en banc). A governmental policy is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (quotation omitted). When, as here, an enactment does not impose criminal penalties, due process tolerates a lesser degree of specificity than it would from a criminal statute. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). "In the

---

[1]In his brief, Keating argues at length that the district court erred in rejecting his other claims. Because Keating did not file a cross-appeal contesting the adverse grant of partial summary judgment, we do not consider his arguments regarding those claims. *See Gross v. FBL Fin. Servs., Inc.*, 588 F.3d 614, 621 (8th Cir. 2009).

public employment context, . . . standards are not void for vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge." *San Filippo v. Bongiovanni*, 961 F.2d 1125, 1136 (3d Cir. 1992). We consider in turn whether the civility clause is void for vagueness facially or as applied to Keating's specific conduct.

Appendix G's civility clause is not facially void for vagueness. A governmental enactment is facially void for vagueness only if it "is impermissibly vague in all of its applications." *Hoffman Estates*, 455 U.S. at 497. Although the policy employs broad language, that alone does not necessarily prevent an ordinary person from recognizing that certain conduct will result in discharge or discipline. Other public-employment policies with similarly general discharge standards have survived void-for-vagueness challenges. *See, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 159-61 (1974); *San Filippo*, 961 F.2d at 1137; *Fowler v. Bd. of Educ.*, 819 F.2d 657, 664-65 (6th Cir. 1987); *cf. Tindle v. Caudell*, 56 F.3d 966, 973 (8th Cir. 1995). While the district court focused exclusively on the policy's use of the term "civility," the civility clause articulates a more comprehensive set of expectations that, taken together, provides employees meaningful notice of the conduct required by the policy. The outer contours of the civility clause perhaps are imprecise, but many instances of faculty misconduct would fall clearly within the clause's proscriptions, thus precluding the conclusion that the policy is facially unconstitutional.

The civility clause also was not impermissibly vague as applied to Keating's specific conduct. Keating's email must be considered within the broader context of this case. As the supervisor of both Keating and Keller, Heaton sought to investigate their dueling accusations while also ensuring that the department operated smoothly. In his email, beyond describing Keller—a colleague who had accused him of sexual harassment—as a "l[y]ing . . ., back-stabbing sneak," Keating expressly refused to comply with a direction from his supervisor. He also signaled an unwillingness to participate with his supervisors collegially in the ongoing operation of the

-4-

department, stating "[t]here is no way I can trust you with another problem" and "I cannot communicate with Dr. Keller." This rebuke followed an in-person meeting with Heaton that Keating described as "heated" and in which Keating "became quite angry." Taken in this context, Keating reasonably should have recognized that his email ran afoul of Appendix G's requirements that faculty discharge their duties "constructively," treat one another "with respect," and act "in ways that will preserve and strengthen the willingness to cooperate." As such, the civility clause was not impermissibly vague as applied to Keating's conduct.

For the foregoing reasons, we reverse the district court's grant of declaratory relief in favor of Keating.

———————————————